923 A.2d 149

**Dennis GORDON**

v.

**Patricia GORDON.**

**No. 976, Sept. Term 2006.**

Court of Special Appeals of Maryland.

May 18, 2007.

584

John H. Doud, III of Baltimore, for appellant.

Alan D. Levenstein of Greenbelt, for appellee.

Argued before HOLLANDER, ADKINS, BARBERA, JJ.

HOLLANDER, J.

This appeal is rooted in divorce proceedings between Dennis Gordon, appellant, and Patricia Gordon, appellee. In a Judgment of Absolute Divorce (the "Judgment") issued by the Circuit Court for Howard County on May 23, 2006, the court, *inter alia*, awarded physical custody of the minor child to appellee, and gave appellee a monetary award that included reimbursement for the wife's contribution of $30,000 in non-marital funds used to acquire the marital home, owned by the parties as tenants by the entirety.

On appeal, Mr. Gordon poses the following four questions:

1. Did the Chancellor err in granting a Marital Property Award to Appellee?

2. Did the Chancellor abuse his discretion in the child custody provisions of the Judgment?

3. Did the Chancellor abuse his discretion when he granted a "Crawford" credit to Appellee?

4. Did the Chancellor err when he declined to find that Appellee was voluntarily impoverished?

For the reasons that follow, we shall affirm in part, vacate in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

The parties were married on June 18, 1994. Their only child, David, was born on July 5, 2001. When the parties separated on November 20, 2004, appellee and David remained in the marital home in Columbia.

On December 6, 2004, appellant filed a "Complaint for Custody, Visitation and Other Relief." Then, on November 28, 2005, he filed an "Amended Complaint for Absolute Divorce."[1] On December 8, 2004, appellee filed her "Complaint for Absolute Divorce, or In the Alternative Limited Divorce, and Other Equitable Relief," which she amended on February 10, 2005, and July 15, 2005. The court consolidated the cases by Order docketed on March 9, 2005.

Following proceedings conducted by a domestic relations master in the summer of 2005, concerning child custody and child support, the master issued findings of fact and recommendations on August 19, 2005. Both sides filed exceptions. Thereafter, on December 19, 2005, the court entered a "Memorandum and Order" and "Order Pendente Lite" granting joint legal custody of David, with primary physical custody to appellee. Appellant was granted visitation, as follows:

Alternate weekends beginning December 15, 2005 from Thursday after daycare/school until Monday at 8:00 a.m.; Tuesday or Wednesday evening each week; on the Tuesday preceding the Defendant's weekend the visitation shall be from after daycare/school until 8:00 p.m. and on the alternate weeks, it shall be Wednesday evening from after daycare/school until Thursday morning at daycare/school[.]

In addition, the court ordered appellant to pay monthly child support of $1,180, retroactive to January 1, 2005. However, because appellant had already paid half of David's preschool expenses, the court reduced that amount to $712 per month. In addition, appellant was ordered to pay arrearages of $5,696 by December 20, 2005. Use and possession of the marital home was awarded to appellee, pending final judgment.

Trial commenced on December 6, 2005, and continued on April 20, 2006, and April 21, 2006. Both parties were in their mid-forties when the trial commenced.

---

1. Appellant requested, *inter alia:* (1) an absolute divorce; (2) joint legal and physical custody of David; (3) a "reasonable schedule of access to [David] . . . ."; and (4) a monetary award.

At the outset of the proceedings, the court reviewed with counsel the issues that were in dispute. The following colloquy is pertinent:

THE COURT: All right. Now, what issues are—are—are settled here?

[APPELLEE'S COUNSEL]: None, Your Honor.

THE COURT: None? No issue is settled?

[APPELLEE'S COUNSEL]: Unfortunately not, Your Honor.

THE COURT: So we're going to have to go through all—all the personal property. . . . Is that what we're going to do?

[APPELLEE'S COUNSEL]: I would certainly hope not. My position has always been that what has been split already is an equitable split of the property and Mrs. Gordon is fine with keeping what's in her home and allowing Mr. Gordon to keep what's in his home and in the storage facility. I don't believe that's Mr. Gordon's position, but that is certainly fine with my client.

\* \* \*

THE COURT: All right. Okay. Now, so let's go over the issues and see—and see what things are about here.

\* \* \*

[APPELLEE'S COUNSEL]: My position, Your Honor, on monetary award is that—is that I would leave for discretional. I can't give you a figure because I think it's unfair to do so. I think the Court is going to need to hear all the evidence and take—and make a decision based upon the equities.

THE COURT: So you—you have no clue?

[APPELLEE'S COUNSEL]: I'm not suggesting that, Your Honor. I think some of it's going to depend on how the testimony falls out.

THE COURT: And you have no clue how the testimony is going to fall out?

[APPELLEE'S COUNSEL]: I—I do, Your Honor.

THE COURT: So what's your position on marital award?

[APPELLEE'S COUNSEL]: My position on marital that Mrs. Gordon is entitled to one, depended Court's other decisions on use and possession—

\* \* \*

THE COURT: Let's assume I gave you everything up to this point that you've talked about [i.e., monthly child support of $1,697; rehabilitative monthly alimony of $500 for two years,[2] three years of use and possession, and *Crawford* credits]. What would be your position on marital award?

[APPELLEE'S COUNSEL]: If you gave us everything that we were to request, Your Honor, then my position on marital award would be that each of them keep what's in their name at this point.

THE COURT: Okay. All right. [Counsel for appellant], all right, what's your position. . . .

\* \* \*

[APPELLANT'S COUNSEL]: Monetary award, I am perfectly satisfied with the parties keeping the titled positions and under which Mrs. Gordon will walk away with far more than Mr. Gordon.[3]

Appellee testified that it was appellant who insisted on the separation. She denied that she asked appellant to leave. Appellant disputed that contention, stating:

---

2. Appellee later withdrew her alimony request.

3. During this discussion, neither side mentioned the wife's request for reimbursement of her nonmarital contribution of $30,000 used in the purchase of the marital home. The matter came up during the course of the wife's direct testimony, when her attorney sought to establish that her $30,000 contribution derived from nonmarital funds. In her Rule 9–207 "Joint Statement of Marital and Non-marital Property," appellee also included a footnote advising of her $30,000 contribution.

[W]e couldn't come to any sort of resolution about the direction our marriage was going to go. And, so, it was obvious that there was going to be no resolution, and it was during that meeting that [appellee] gave me an invitation to leave and her words to me was, were, you have my permission to go. And that was one of many invitations that she had given me over the years, in fact, for the two years leading up to the mediation, I mean, I had monthly invitations to go.

Mr. Gordon left the marital home on November 20, 2004, while appellee and David were out-of-town, visiting her parents. He acknowledged that he "did not tell [appellee] the specific date that I was leaving ....", but explained that "there was no hope to ... reconcile, and to heal our marriage." The following exchange is also noteworthy:

[APPELLEE'S COUNSEL]: So, when she came back from being on vacation, and you weren't there, that wasn't something she would have been expecting?

[APPELLANT]: No, it wouldn't.

During the marriage, both parties worked outside the home. Appellant has a master's degree and works in the banking industry. Appellee, who holds a bachelor of science degree, has been a consultant to the health and welfare benefits industry. For much of the marriage, appellee's income exceeded appellant's.

In February of 2002, appellant lost his job with Bank of America, when the bank moved its credit division to North Carolina. Until then, the parties had evenly divided all living expenses, although appellant earned less than appellee. As a consequence of appellant's unemployment, appellee assumed financial responsibility for 60% of the family's expenses. Appellant remained unemployed until April of 2003, when he began working as a financial analyst for Provident Bank. Appellant earned gross wages of approximately $70,000 and $73,000 in 2004 and 2005, respectively, and expected to earn approximately $75,000 in 2006, excluding bonuses.

During the marriage, appellee worked for AON Consulting ("AON") in Bethesda, providing consulting services for employee benefits plans. In 2002 and 2003, she earned approximately $107,000 and $103,400, respectively. From January through September of 2004, appellee earned approximately $113,406.

Beginning in January 2004, appellee worked from home one day a week. However, on September 21, 2004, appellee received a letter of reprimand from her employer, claiming she had insufficient billable hours and business development. At trial, appellee explained that her sales were "a little bit low and they determined that my performance in terms of how much business I had developed was not sufficient." Appellee tendered her resignation from AON on September 24, 2004, with two weeks notice. The following discussion is relevant:

[APPELLEE'S COUNSEL]: Did you speak to Mr. Gordon upon your receipt of this letter or memo [of reprimand]?

[APPELLEE]: That evening I did.

[APPELLEE'S COUNSEL]: And what was the substance of that discussion?

[APPELLEE]: I told Dennis what had transpired and what the discussion was between the two managers that had met with me and I told him that I could not meet the expectations that they had for me up to and including that they were now requiring that I show up in Bethesda every day between set and specific hours. I had never worked any set and specific hours in 12 years. And in order—and I had just worked out earlier that year with them an arrangement to have a flexible schedule. I didn't know—if I didn't have the ability over the years to get the type of revenue they were expecting, I couldn't have that in 60 days that they were requiring.

I discussed it with Dennis and I said, I don't think I have a choice left here based on this review except to leave. And he said, well, why don't you leave tomorrow. And I said, well, I at least need to get all of my things gathered, put together all of my reference[s] and other information so that

I have some ability to look for work at some other point. At this point too, my stress level was really poor—I had such high stress. I'm not a very big person and I had lost 15 pounds dealing with the stress of work and my marriage. I was down to about 100 pounds. My heart was palpitating. And I—I also said to Dennis that night, I said, either this job is going to kill me or you will, this marriage thing. And I'm not going to have both, so I needed to focus on our family.

[APPELLEE'S COUNSEL]: So what did you do as a result of the performance review and your discussion with your husband and your decision—own decision-making?

[APPELLEE]: I turned in my resignation [to AON] on the 24th [of September of 2004].

Appellant's recollection of events is reflected in the following testimony:

[APPELLANT'S COUNSEL]: ... What knowledge did you acquire about [appellee's] termination with Aon?

[APPELLANT]: She came to me and told me that she was going to resign, she had already made the decision.

[APPELLANT'S COUNSEL]: Did she explain why?

[APPELLANT]: Well, she just didn't appreciate the reprimand that she had been given, and decided that she wasn't going to step up and do what they asked.

[APPELLANT'S COUNSEL]: And what was your reaction to that, if any?

[APPELLANT]: Well, I didn't react to it, because I knew she, you know, she was under pressure to increase her performance. And that was the point where, you know, she was given the reprimand.

Her question to me was, when should she resign, not if she should resign. And I said to her, well, if you are going to resign, you can do it tomorrow, because it is not going to make a difference in the end.

And that was the advice she asked for [sic] me, and she didn't take that advice.

On cross-examination, the following transpired:

[APPELLEE'S COUNSEL]: [I]t was the beginning of October '04 approximately that she resigned?

[APPELLANT]: I believe it was October 8th.[4]

[APPELLEE'S COUNSEL]: Okay, and you left [the marital home] on November 20th, of '04?

[APPELLANT]: That is correct.

* * *

[APPELLEE'S COUNSEL]: Okay, at the time that Ms. Gordon resigned Aon, and she came to you and told her [sic] of the situation, did you tell her that I'm going to be leaving the home, this may not be a good idea?

[APPELLANT]: She had been telling me to leave, so, I mean, no, I didn't tell her I'm leaving, she had been giving me invitations, in fact, during the month of October, you know, maybe two or three times, she gave me leave to go.

[APPELLEE'S COUNSEL]: She—but she had been giving you invitations to leave, by your testimony, for two years.

[APPELLANT]: That's right.

[APPELLEE'S COUNSEL]: And you hadn't left, you hadn't left in two years, at that time, correct?

[APPELLANT]: That's right, but the event that finally made the decision was the mediation meeting on the 15th of October, 2004.

[APPELLEE' S COUNSEL]: Which would have been after she had resigned from Aon, correct?

[APPELLANT]: That would be correct.

In January of 2005, appellee commenced full-time employment with Human Capital Consultants, LLC ("HCC"), with an annual base salary of $50,000, plus a 25% commission. In

---

4. From appellee's testimony, it appears that October 8, 2004, was appellee's last day of employment with AON.

September of 2005, however, HCC changed appellee's compensation to a 35% commission, without any base salary, "pending the development and successful award of contracts" to the firm. By that time, appellee had earned $35,737 for the year. When trial resumed in April 2006, appellee's compensation package had changed again; she earned a base salary of $25,000 per year, plus commission.[5]

Ms. Gordon explained that she did not immediately leave HCC because she felt that several proposals she had submitted while at the firm might prove successful, which would improve her compensation package. Nevertheless, she was seeking other employment. Appellee stated: "I prepared my resume and I've submitted my resume to several companies locally based in response to positions that they've posted that could utilize my current skills that [sic] and develop others." Beginning in October 2005, she "applied for three positions." The following colloquy is relevant:

> [APPELLEE'S COUNSEL]: Okay. Did you make a decision ultimately not to leave the employment of Human Capital Consultants?
>
> [APPELLEE]: I decided to work at Human Capital Consultants concurrent with looking for other work, because one of the things I had done and felt I had done somewhat successfully was to—we hadn't won the contract, but we had made a lot of progress towards getting close to some significant rewards and the type of work that we were doing and the type of work that we want to do long term. So concurrent with looking for another job, I've continued to do things like write proposals for work in the employee benefits field. Many, many proposals and continue to believe that the business that I work for is one that in a matter of time, will be very successful, beyond where we've been.
>
> * * *
>
> [APPELLEE'S COUNSEL]: Okay. What is your present plan with regard to your employment?

---

5. The record does not disclose the percentage.

[APPELLEE]: Oh, we're very hopeful at Human Capital Consultants that some of the proposals that we made to various organizations in the metropolitan—in the mid-Atlantic area will be successful and allow for the firm to restore and/or improve on my—on the salary package that I had before. I do believe that.

\* \* \*

[APPELLEE'S COUNSEL]: [D]id you ask [your boss] to change your compensation rate in September of '04—'05?

[APPELLEE]: I did not.

[APPELLEE'S COUNSEL]: Did you ask him to reconsider his decision to take you off a $50,000 base and 25 percent commission?

[APPELLEE]: [My employer] said that the financial position of the firm was one that required additional revenues to be received before he could restore the compensation—the base—at least the base salary portion of compensation. But again, we had been on several pieces of business and we weren't successful. Some of those reasons being the use of our company. But we felt that we have a combined package of skills in the four people in the organization to ultimately be awarded business similar to what I've always done in terms of employee benefits consultant services. So the hope was that as quickly as we would win a bid, the compensation portion of it could be restored.

\* \* \*

[APPELLEE'S COUNSEL]: Have you given yourself any kind of time period to start to earn income from your commission on these status [sic] at the present time at Human Capital?

[APPELLEE]: Yes, I have.... I have determined that I would try diligently with the fir[m] to continue business development for about three to six months. And again, at the same time, I would continue to look for a position. One of the positions that I've applied for is at Turk Value

Resource. They're look [sic] for a human resource direct [sic] and I've applied for [t]hat position within the last couple of weeks. But my goal in sort of determining what I can do and when certainly is taking into consideration what I need to do as a single mother.

With regard to appellant's claim that appellee is voluntarily impoverished, the following testimony is relevant:

[APPELLANT'S COUNSEL]: And would you tell us please who you've applied for other jobs with other than Turk Valley (phonetic).

[APPELLEE]: I applied at the University of Maryland, Medical Center in Baltimore and I applied at Constellation Energy in Baltimore.

[APPELLANT'S COUNSEL]: Now, when you applied to the job at the University of Maryland, did you apply for a job comparable to the one you had at AON?

[APPELLEE]: They're not an employee Benefits Consulting firm. I applied for the position of Benefits Manager.

[APPELLANT'S COUNSEL]: Benefits Manager. So that would not have been at a salary level that was consistent with what you earned at AON, would it?

[APPELLEE]: I don't know. First of all, it's in a different marketplace than my AON position. I think it would be at a lower salary level. But I'll have to make a decision about being a single mother and caring for David. And I've decided that any employment that I take, needs to take that into consideration. And I've personally made a decision that the furthest job that I would go—as far out as I would go would be maybe Baltimore to work. I drove into Bethesda for 12 years enduring incredible commutes. Particularly on days . . . when it would snow and I had three and four hour commutes. It wasn't conducive to my relationship with David before and I'm not feeling like that's the direction I want to take, any employment that I take, which is why I chose Human Capital Consultant[s]. And which is why I've stayed there. [I]t puts me close to David. Flexibility to get him. . . . I can set my hours and once we're

successful in landing the type of work that we've been bidding on, I firmly believe that it will continue to offer me the type of flexibility that I've had over the last year.

\* \* \*

[APPELLANT'S COUNSEL]: Let me—let me see if I understand what you're saying. What you're saying, I think is, that as a single mom, you're prepared to take a position paying you less money than you earned when you were at AON as long as it keeps you close to home?

[APPELLEE]: What I'm saying is, I'm looking for positions that can utilize my current skills, develop others, maybe continue to stay [i]n employee benefits consulting and remain close to my family. I have struggled with that through the years. Dennis is very aware of the struggle we had with that. I'm committed to David and if that means that I cannot obtain the exact same salary for driving inside the Beltway in Washington, that's what it means. . . .

[APPELLANT'S COUNSEL]: Okay. Now, you will agree, will you not Mrs. Gordon, that as a result of the experience that you've had in this industry, you are capable of earning a six-figure salary?

[APPELLEE]: Right now no. The reality of my position is this, [appellant's counsel], it is that I would have to develop a book of business similar to the responsibility I have at Human Capital Consultant[s]. I couldn't automatically take or move my clients over. Some of the clients I serviced are no longer in business. They've been merged into larger organizations and I would have to develop a book of business. That is what I started with Human Capital Consultants and I continue to do today. The companies that I— are competitors to AON Consulting where I worked before, are in locations like Northern Virginia, Washington, DC, and even further away than where I was before. They are not an option for me.

[APPELLANT'S COUNSEL]: They are not an option because you don't want to work far a field.

[APPELLEE]: I cannot commute into Washington, DC and maintain any relationship with—with David on a regular basis.

[APPELLANT'S COUNSEL]: But if you took a job in Washington, DC, you would agree, would you not, that you are employable at a six-figure salary.

[APPELLEE]: As long as David can move to Washington, DC with me, yes.

[APPELLANT'S COUNSEL]: Okay. Your current situation, in effect, is that you are hoping that Human Capital Consultants will succeed?

[APPELLEE]: Yes, and it's no different than I had at AON.

\* \* \*

[APPELLANT'S COUNSEL]: And so ... you're willing to work, even though you're earning no income? Is that accurate?

[APPELLEE]: I'm doing two things at one time. I'm looking for the possibility of maybe a more stable type or different type of position within an established—longer term established operation. But that doesn't mean that they don't have layoffs. One of the companies I tried to talk to, was Computer Sciences Corporation. One, a Human Resource Director there had met with me and talked about several positions only for—within a couple of weeks that she was trying to assist me in looking at positions of the facilities along Route 30, that they announced that they were on the market. Even large size companies, CSC had 78,000 employees. That company is projected to be bought by Loc-key [sic], Martin, Northup Grumman [sic] or Bowing [sic]. One of those large—even larger companies. I don't think there is any guarantee that even Provident Bank where Dennis is going to be there. Bank of America ripped his whole department. I can't sit and say that there's any insurance in any position that I would take in terms of where it would be long term. I think when we go to work,

we assume that there maybe there might be a job or maybe there won't be. I'm trying to make more of my way and I believe that I can work with [my employer] to sort of develop something that can be there longer term.

\* \* \*

[APPELLANT'S COUNSEL]: ... But you're willing to essentially to work for free for six months to give that a try, is that accurate?

[APPELLEE]: That's my personal decision.

Both parties were actively involved with David's care during the marriage. The parties agree that David performed well in pre-school and is in excellent health. There is no contention that either party is an unfit parent.

After David's birth, appellee took twelve weeks of maternity leave, plus "an additional transitional period back to work of four weeks." Appellant took paternity leave for six weeks. Describing the parties' respective responsibilities with David following his birth, appellee recalled:

> We all sort of helped in caring for David. [My] Mom arrived about two weeks after David was born. And we split—Dennis and I had sort of split the day where he did a lot of the later hours. I was nursing David, so it was very important [for] me to eat and get proper rest so that my body would respond in a fashion to be able to nurse David. So he would watch over David when I would try to rest. So we shared a lot of sort of that caring for David.

In contemplation of appellee's return to work, the parties hired a nanny in November of 2001. As noted, a few months later, in February of 2002, appellant lost his job with Bank of America and remained unemployed until April of 2003. Although the parties initially retained their nanny while appellant sought employment, appellant fired the nanny in May of 2002 because, according to appellee, "he had found her in a couple of situations where he felt that the safety of David was at risk." Appellee further recalled that, "after four or five weeks," appellant decided that he did not want to care for

David, and started looking for additional child care. Thus, in June of 2002, the parties enrolled David at the Goddard School.

Appellee described her parental responsibilities during the ten-month period of appellant's unemployment, stating:

> [W]hen I got home, I would still—I still assumed caring for David in the evenings, in terms of engaging him, playing with him. In the morn [ing]—it got to the point where in the morning I couldn't even leave as I wanted to. You know, leaving a small child anywhere, at least for me as a mother, was very difficult. Often times, I wished I could reverse my position with Dave—with Dennis because I would have wanted to stay with him. But I would—I would play with David and I would get him ready—help get him ready for bed. Still go in and check on him during the night.

\* \* \*

> [APPELLEE'S COUNSEL]: During that ten-month period of time on those weekends, was Mr. Gordon participating with you and Den—David during the weekends in activities?

> [APPELLEE]: Not always. Dennis—Dennis never changed his schedule when he wasn't working. I often encouraged him to—to do all the little things. The getting the groceries, the running the errands during the week so that we could focus on family time on the weekend and he didn't. For example, he would still do grocery shopping on Sunday morning because that was his schedule and that's how he wanted it. So it left a lot of—a huge block of time, frankly, for David and me to spend together alone. He was too busy with the chores not wanting to do them during the week. Even as I work, I still did all the laundry and I still cleaned up when the cleaning lady wasn't there. I always vacuumed. I always made beds. I always did all that stuff. I changed beds, all that, cleaned up. Those were things that I continued to do . . .

As to visitation, appellee testified that she was "willing to live" with the *pendente lite* schedule, but considered "the midweek disruption for the overnight visit to be somewhat not the best working part of it." She preferred weekend visitation for appellant, along with a mid-week dinner, explaining:

I believe a weekend arrangement that starts on Fridays, returning David to school on Mondays and a mid week [sic] dinner arrangement would be in David's interest. And I believe that because David needs some stability. And he— for him to know when things start, when—and what the expectation of—is of—where he's going to be at the next point. As few transitions as possible. Living in a home where there's some stability for him in terms of this is home and this [is] where I come. That's what I believe David needs.

According to appellee, it was not in David's best interest for the parties to alternate weekly custody. She explained:

Well, for one thing, Dennis and I—I think that Dennis and I do not communicate well enough to make a scenario like that work. And David we've established some roots within Columbia that he's very aware of. And he needs some stability. He's already dealing with separated [sic] and parent and having issues with that . . .

\* \* \*

And he is asking a lot of questions. He is dealing with the whole issue of why daddy isn't here. When he observes other families with a daddy and he needs to have some stability that provides for him some continuity during the week. You know, someone who's responsible for him to get—to make sure there isn't the disruption of, for example, if he starts his karate—his gymnastic classes on Thursdays where he could go to some classes.

Appellee also maintained that appellant had not availed himself of all of his visitation opportunities. She stated:

I really struggle with this because Dennis has said time and time again, he wants to do things, but then the actions

that I've seen behind what—what's been done, has been so inconsistent. And I feel that it disappoints David a lot of times. Even when he's late picking him up, David is waiting. He's anxious. And if a commitment cannot be made, even when there's been the few times over the last several months in terms of keeping something on a timely basis, time and time again doing something, I just feel that information has been lost. And honestly, he has been, just looking at the—he supported financially David's education, but he's never at the school. I don't understand that. [H]e never does [sic] to the school, except to talk to the teacher once in a while and won't participate in any activities. Even though he knows they're going on, I really struggle with how [t]o connect those two things.

When appellee's counsel asked appellee whether she thought appellant wanted to be a part of David's life, she responded:

He doesn't. . . . I invited him to come to [David's school] evaluation and he didn't come. He knew there were field trips, he didn't come. I'm questioning what he really wants to do. He—I even invited him back in the spring to David's choir performance at church. He was singing in the Easter play. He didn't come. He doesn't tell me he's not coming, but I've extended an offer for him to participate. He gave up gymnastics well before he left our home. He wasn't interested. Dennis even suggested that if it wasn't fun for him, he had no interest in doing these things.

I would disagree [sic] that parenting is not necessarily about me having fun, but helping to develop him. With the type of energy, compassion and those types of things. And I've dedicated myself since day one to doing that. He's been invited a lot of times and he doesn't show.

The following colloquy on cross-examination is also relevant:

[APPELLANT'S COUNSEL]: [Appellant] has asked to have equal time with the child . . . has he not?

[APPELLEE]: And I've—I have—he has asked—[APPEL-LANT'S COUNSEL]: And you have refused.

[APPELLEE]: I have not refused. I have suggested to him a schedule that I believe to be in David's interest.

[APPELLANT'S COUNSEL]: I see, but didn't Mr. Gordon tell you that he thought that he had some idea of David's best interest as well?

[APPELLEE]: He, he didn't.

[APPELLANT'S COUNSEL]: Well, do you concede his role as a father to have an equal voice with you in determining the child's best interest?

[APPELLEE]: I believe Dennis and I can at some point maybe work out some discussion around what might be good for David and his education and some of his upbringing. The difference is, we don't agree on much. And that often leaves—would leave David without anything. That's been the case before when he was at the home, he would just say go ahead, and that's what I did. I—I was the one who thought of the activities to sort of point David in the direction that he—he wouldn't come to a lot of these activities. [Appellant] had no interest and he didn't want to do these things. He wouldn't take the time to research a suggestion and try to have it work, so I did. I came up with gymnastics. I came up with a lot of these things that we did as a family or then separately, just as David and me. I was always the one really looking out for that portion of David's life. What could he be involved with to help him develop even outside of school.

School is a good example. [Appellant] had full access to everything at Goddard. And he didn't—and for an entire year now, except for ... a couple of visits and taking David out to lunch, not sitting with him in his class necessarily, and I think that maybe he went to the father's day activity, but that was it. There's a lot that you don't know about the child if you don't do that.... It's more—there's involvement during the day that has to take place. You don't just drop him off and pick him up. I've already learned that if you don't stay involved with the school, you will diminish how much your child really gets out of it.

I try to stay involved with David and his activities, even if it means I miss something at work. Even if it means I miss something that I want to do. I've done that. I've made the sacrifice. I can't say that Dennis has. I don't see that that's what he really wants to do.

Appellant disputed appellee's account. When asked about his involvement in David's life, appellant testified that, other than breast-feeding, he did "everything else ... in abundance." The following colloquy is pertinent:

[APPELLANT'S COUNSEL]: Compared to Mrs. Gordon, were there any activities, or times, or specifics of childcare that you did not do, other than the breast-feeding that you just mentioned?

[APPELLANT]: No, I mean, I made most, I was the cook in the house, for the most part. I made all of his meals, his lunches, served everybody dinner. And you know, I did the grocery shopping and everything for the family. Ran the household errands, paid the household bills. . . .

With regard to appellant's involvement with David's pre-school, appellant testified as follows:

Well, for the most part, well, I say most frequently [it] has been dropping him off, picking him up, you know, of course, that happens daily. And at least, daily I was doing either drop off or pick up. And for about 13 months I was doing drop off and pick up.

And since, and I make sure that I talk to the teachers about his performance, how he has been progressing. And, in fact, since November of 2004, I've had six parent teacher conferences with his teachers, and they only give report cards out twice a year, so I have had many more conferences than they would normally ask you to do. And sometimes I'll attend special occasions, like last year, I attended the Father's day they had, and so forth.

David has his own bedroom at appellant's apartment, with a playground and pool nearby. During visitation, appellant attends to David's meals and his hygiene. Moreover, appellant did not believe that David's upcoming enrollment in

kindergarten at a Clarksville public school would present any difficulties for appellant.[6] Mr. Gordon also acknowledged that David has adjusted "very well" to the visitation schedule, stating:

David has always been very happy, and he is very cheerful, always in good spirits, playful. He knows the schedule of when he is going to visit next, how long he is going to stay, he makes plans for what he is going to do when he comes back, and he is very well adjusted. There has been no problems transferring to, from, mid week or not, I mean, there has been no, no indication of any problem at all.

Nevertheless, appellant complained that the amount of time he spent with David under the *pendente lite* order was "much, much less" than he had spent with David historically; he sought equal access to his child. The following exchange is relevant:

[APPELLANT'S COUNSEL]: Are you ... based on your historical involvement with [David], a fit and proper person to have custody of him?

[APPELLANT]: I am.

[APPELLANT'S COUNSEL]: If the Court were to tell you, look, Mr. Gordon, I want you to write the visit—the child access schedule for this boy, what do you think would be in his best interest?

[APPELLANT]: It would be in David's best interest to have both me and Pat involved as fully as possible in David's life. He shouldn't be deprived of Mother nor Father, and then that would be the foundation—

[APPELLANT'S COUNSEL]: Well, how would you practically implement that?

[APPELLANT]: I guess, practically, I mean, if you want to look at it, I think, in the most fair way that I can think of,

---

**6.** Derek Southard, David's godfather and a close friend of appellant, lives nearby. He testified that he is able and willing to help with David should appellant need assistance.

you know, having joint legal custody and splitting 50/50 the time with him, you know, as well as we can do that.

[APPELLANT'S COUNSEL]: Based on the location of your employment, the location of Mrs. Gordon's employment, your residence, her residence, Goddard School and the new elementary school that he will be going to, can that practically be arranged?

[APPELLANT]: Well, yes it can because, you know, he would be only, again, about the same distance from the house, except it is in the opposite direction. And so it is no difference logistically than it had been previously.

[APPELLANT'S COUNSEL]: A week away from Mom might seem like a long time to a little boy. Is David allowed to telephone his mother while he is in your care?

[APPELLANT]: Yes, he is, David can telephone mommy whenever, whenever he likes.

According to appellant, he is able to communicate effectively with appellee, so as to permit the court to implement a joint custodial arrangement. He said:

[W]e were able to you know, take the *[pendente lite]* order and vary from that, and discuss it and come to some decisions about what we could to do, you know, get David back and forth to where he needed to be, and to meet his needs.

We make phone calls to each other, even sometimes, phone calls for some things that seem minor, like I left his coat, and she called me and said, hey, you left his coat, I'll give it to you at some point in time. Or hey, you need to buy him a new toothbrush, the Doctor said so, because, you know, because of [getting] strep. So, those kinds of communications are going on.

And [we e-mail], I mean, if you read the e-mails you will see the kind of communication that has been going on between us to talk about all of the issues, getting him back and forth to church, choir practice, you know, when he has been sick, you know she would call me and tell me what has been going on, so the kind of communication that we need to

undertake, is there, and again, the e-mails would show that. The visitation log shows that, so, I mean, so, we are doing it, we are doing it.

The parties also testified about the marital home, located at 6424 Empty Song Road in Columbia, which was purchased on July 19, 1995, for $295,188, and titled as tenants by the entirety ("TBE"). In connection with that purchase, it is undisputed that appellee contributed $30,000 from her non-marital 401(k) account. The parties valued the home at approximately $600,000, with remaining indebtedness on the property of $285,000.

In her testimony, appellant addressed her contribution of $30,000 used to acquire the marital home. She stated: "[W]e were recently married and wanted to purchase the home and I had a retirement account with Cigna of about $40,000.00 at the time. And I removed $30,000.00 from my retirement account to help fund the purchase of our home." Appellee noted that she "worked for Cigna right out of college," from "June of 1982 until August of 1992." She confirmed that "all contributions made to that Cigna 401k account were made during [that] period of time." When appellee's counsel asked her if there was "any particular reason" that "the money came from [her] 401k," appellant explained:

> There's a couple of reasons. First, it was the place we had money to access the purchase of the home. We had just been married in 1994 and had paid for our own wedding so we didn't have anywhere else to get money. But the builder had made us a good enough offer. And that was— Dennis suggested that it was an exchange of one asset for another. So we went ahead and we did that.[7]

Appellant testified that he regarded the $30,000 contributed by appellee as a gift to the marriage. He explained:

---

7. Notably, appellee never stated that the parties understood that she was to be reimbursed in the event of the dissolution of the marriage. Nor did she assert that the money was not a gift to the marriage.

[APPELLANT]: ... [W]hen we got back from our honey-moon in, I guess it was late June of 1994, Pat brought up the subject of buying the house. My response to her was, you know, why don't we—you know, we didn't have any money left, I mean, so we needed to save for the down payment on the house.

So, you know, it might take us a year, 18 months before we could buy a house. Well, she wasn't quite satisfied with waiting that long, and so she offered up voluntarily, her 401K account to put on the down payment. And I didn't want to do that, and in fact, I resisted that.

But she kept insisting, and so she, as far as I was concerned, gave a gift to the marriage, and I looked at it and said, well, you know, it is really moving, from one asset to another, in other words, this wasn't going to go to waste. So, you know, and with her insistence, you know, we went ahead.

[APPELLANT'S COUNSEL]: Did she ever ask you to repay that $30,000?

[APPELLANT]: No, she didn't.

[APPELLANT'S COUNSEL]: Did she ever give you any indication, prior to this law suit, to suggest that she regard-ed it as anything other than a gift?

[APPELLANT]: No, she didn't?

With regard to the use of her $30,000, appellee explained: [I]t was the place we had money to access the purchase of the home. We had just been married in 1994 and had paid for our own wedding so we didn't have anywhere else to get money. But the builder made us a good enough offer. And that was—Dennis suggested that it was an exchange of one asset for another. So we went ahead and we did that.

Appellant drew approximately $15,300 from the parties' home equity line between the fall of 2003 and the fall of 2004. He testified that approximately $5,000 was used to pay off credit card debt, incurred prior to the separation, and the remainder was used to cover expenses associated with setting up a new residence after the separation.

On July 21, 2004, appellee obtained $5,900 from the parties' home equity line to pay property taxes. That month, she drew another $5,700 from the home equity line to pay bills for the home. From the time of separation in November 2004 through November 2005, appellee paid the monthly mortgage payments of $1637.45, and the monthly line of credit payments ($317 per month). She also paid $1,200 for the annual Columbia Association Parks and Recreation assessment; $2,600 for the Howard County tax bill, and $900 for insurance on the marital home. Appellant did not contribute to these expenses.[8] When asked how she afforded these payments, appellee responded:

> I've made the payments through the salary that I've earned as well as some savings that I've had [sic] accumulated prior to our separation. And I had one account where I had some cash stocks that I had purchased from AON. And that amount of money I've used as a supplement to my salary to pay for the household expenses.

Further, appellee noted that, at the time of separation, she had a "savings" account in her name, worth approximately $17,000. Appellee testified that, after the change in her compensation package with HCC in September of 2005 she used "the majority of the money" to cover the mortgage and other household expenses. By the time of trial, the account was almost depleted.

In addition, in January of 2006 appellee replaced the furnace in the home, at a cost of $2,829, by using $2,500 from David's Uniform Transfers to Minors Account ("UTMA"). She explained that she did not receive the $6,000 income tax refund that she had expected, because appellant took certain deductions that she had intended to take, without conferring with her. The following dialogue is relevant:

> THE COURT: ... All right, so why did you take the money out of the UTMA account?

---

**8.** From November of 2004 to the time of trial in December of 2005, appellant did not pay child support, but did pay half of David's tuition at the Goddard School.

[APPELLEE]: Because I did not have enough funds to cover certain bills for the home. And I was anticipating a return, after my taxes were filed on March 17, and up to and through currently, I have not been able to get my returns accomplished, because of ... deductions that have been taken on the home by Dennis.

\* \* \*

And there is conflict as to those deductions. And he took credit for David, and he took credit for the ·mortgage interest amounts.

Appellant conceded that he took deductions for half of the mortgage interest payments, half of the taxes paid on the real property, and half of the home insurance for tax year 2005, as the parties had previously done in 2004. He also acknowledged that he claimed David as a dependent.

At the time of trial, Mr. Gordon had approximately $147,000 in retirement accounts with Bank of America titled in his name, most of which was acquired during the marriage. He also had approximately $25,000 of marital property in retirement accounts, titled in his name, with Provident Bank. Appellee had approximately $78,000 in a retirement account titled in her name, most of which was acquired during the marriage. She also had title to approximately $125,000 in other retirement and investment accounts, which the parties agreed constituted marital property. In addition, appellee held an annuity, which the parties agreed was marital property, that would pay nearly $900 per month upon her retirement. She also held a nonmarital monthly annuity, which would pay approximately $630 per month, which was to go into effect in 2026, and a nonmarital retirement account valued at approximately $20,000.

At the close of evidence, appellee asked the court to award her a *Crawford* credit, because it was "uncontroverted" that, during the eighteen months between separation and the trial, she paid the carrying costs for the home, as well as other house-related expenses, totaling $41,172. In particular, appel-

lee's counsel requested a "credit of approximately forty percent of what [appellee] paid," i.e., $16,418.60. Further, appellee requested reimbursement of the $30,000 in "premarital assets" that she had contributed to the purchase of the marital home, as well as reimbursement of the $2,829 paid to replace the furnace. She also requested an award of $15,300, representing the amount of money appellant withdrew from the home equity line. Thus, she requested a total award of $64,547.60.

Notably, in support of her request for reimbursement of $30,000, appellee did not rely on any of the statutory factors pertinent to a monetary award, other than F.L. § 8–205(b)(9). Instead, her counsel maintained that appellee traced the source of funds used by appellee to a "pre-marital" asset, arguing:

> [Appellee] contributed Thirty Thousand Dollars from her pre-marital asset. The parties have stipulated that the asset that she took it from, which is again uncontroverted, was a pre-marital asset. Mr. Gordon testified that she took the money out of there because she wanted to get into a house, and Mr. Gordon contends that it was a gift to the marriage. That's the only evidence at all that there was a gift to the marriage. It's certainly not Mrs. Gordon's position. She never said it was a gift to the marriage. *Did she ever specifically tell Mr. Gordon that she was expecting it back? No. Did she ever say she wasn't? No.* But what she did do is, she got—she has the documentation [of] where the money came from, that it was pre-marital, and *the case law is clear that she's able to trace the source of those funds. They were pre-marital funds. It got the parties a marital asset, and ended up benefitting Mr. Gordon,* because he's now sitting on a substantial amount of that booty as well. And she is entitled to the Thirty Thousand Dollars back out of the top of the equity before any split between the parties.

(Emphasis added.)

Appellant argued that appellee should not be awarded a *Crawford* credit for the costs expended in maintaining the

marital home, because she utilized marital funds to pay the expenses. As to the money he drew on the home equity line, appellant argued that unless the court found that he dissipated the funds, there was no authority for the court "to allocate funds back to the other side." Moreover, in regard to child support, he claimed that appellee was voluntarily impoverished.

As to the $30,000 of nonmarital funds contributed by appellee towards the purchase of the marital home, appellant insisted it constituted a gift to the marriage. He asserted, in part:

> There was no question about the Thirty Thousand Dollars until we got into this lawsuit. At the time the house was purchased, there was no indication that that Thirty Thousand Dollars was anything but a gift to the marriage.... [F.L. § ] 8–201 defines marital property as any interest in real property held by the parties as tenants by the entireties, unless it's excluded by a valid agreement. Now, that wasn't done here. So what we have is a marital property and a presumed gift. There's simply no way to get around it, because there's no evidence to the contrary. It is a little cheeky, if I do say so, that Mrs. Gordon at this stage would make such a demand.

The following exchange is also pertinent:

> THE COURT: Well, you could—you could do it; you could back-end it ... As a marital award.... If you thought it was, like, fairness dictated .... [i]t, or whatever ... You know, you can go back that way.
>
> [APPELLANT'S COUNSEL]: That's right; that's the only way you can do it under ... those eleven points, to try to do that. Right.
>
> THE COURT: Right; yeah ... Yeah ...
>
> [APPELLANT'S COUNSEL]: Offsetting any equities in that regard, the Court should consider, this was a marriage in which the parties split the expense of the house fifty-fifty for most of the marriage. Even though Mrs. Gordon outperformed Mr. Gordon in income something like sixty-forty

... So Mr. Gordon was always over-contributing, and as an equitable offset, that factor should be kept in mind.

\* \* \*

As I indicated before, Mr. Gordon has never sought to recover Mrs. Gordon['s] property. He has always proposed that there be a walk-away. She keeps what she has; he keeps what he has. In that walk-away, Mrs. Gordon comes out—

\* \* \*

THE COURT: But, I mean, you're suggesting, like, a walkaway, and he's suggesting walk-away, ... except for the Thirty Thousand—

\* \* \*

[APPELLANT'S COUNSEL]: I want to—I want to emphasize to the Court, however—

THE COURT: All right ...

[APPELLANT'S COUNSEL]:—That when the parties walk away, Mrs. Gordon walks away with considerably more.

THE COURT: Well ...

[APPELLANT'S COUNSEL]: That's what you have to keep in mind, because at the end of the day, she has what's shown as marital assets that we could put a definition on.

THE COURT: Right.

[APPELLANT'S COUNSEL]: She also has these two annuities

THE COURT: Right ...

[APPELLANT'S COUNSEL]:—That she doesn't want to put a definition on, but clearly, by admission of counsel, have a value. Now, I don't care what that value is, whether it's a Dollar or a Hundred Thousand Dollars. The point is, it's hers, and she walks away with it, and she has it for the future; he doesn't. . . .

Moreover, appellant's counsel argued:

[I]f the Court please, the marital property statute, 8–205, lists eleven criteria that you have to apply before you can grant a marital award. Under the circumstances of this case, where you have two parties whose property interests post-divorce will not be remarkably dissimilar, except that Mrs. Gordon will have more; in which there are no real fault grounds ascribable to either side more than the other; in which their contributions to the marriage are more or less the same . . .; in which the economic circumstances are such that Mrs. Gordon clearly has a high income potential whenever she chooses to exercise it; in which the economic circumstances are the same right now—both have their own residences and their own lives; in which the age of the parties is relatively young . . . in which the—the parties have been married for a modest period of time, nearly ten years, or twelve years through the date of divorce, there are really no compelling grounds that I could see under the statute for you to want to back into a marital property award.

In rebuttal, appellee's counsel argued, in part:

Your Honor, with regard to the marital award, I just wanted to clarify for the Court . . . I am in essence seeking a walk-away with everything except the claims to the house . . . However the Court wanted to fashion an order that would be equitable regarding Mrs. Gordon's pre-marital contribution toward the home is certainly discretionary by the Court. And . . . if the Court feels that it's appropriate, it certainly has the wherewithal to do it in a marital award that can then be deducted from the proceeds of the sale of the home. . . .

At the conclusion of trial, the court observed that it had "heard many days of testimony in this case, has heard arguments from counsel, [and] reviewed the various submissions." Moreover, it noted that it "had an opportunity to deal with this case in connection with dealing with the exceptions. . . ."

The court carefully addressed the issues of child custody and visitation. In awarding joint legal custody, with primary physical custody to appellee, the court reasoned:

The issue that's—has divided the parties continuously throughout this proceeding has been the custody of—the custody arrangements regarding David and the access to David by the parents. And it's clear to this Court's judgment on everything it's heard, is that despite the attempts of both parties to paint the other in a negative light, that they both appear to be very good parents and very devoted parents, and David is lucky to have them as parents. And they both appear to the Court to be—certainly, I don't think—there's no argument to the contrary that both are certainly fit parents, and as a matter of fact, meet a standard much higher than that threshold. And the court believes that ... situation is fortunate, and the Court—the Court has thought about this issue quite a bit back when it issued the *pendente lite* order, which I think was no one's suggestion at the time, and the Court fashioned the order which provided a structure here. I certainly hear Mr. Gordon's arguments here that, well, you ought to have a fifty-fifty, and that should be it with—absent something being shown. I, you know, in this case, considering all the factors, considering the—the total history here ... At times, Mr. Gordon has been less attentive than at other times, even—you know, under this current order. I think there's some evidence that Mr. Gordon has not completely utilized all opportunities that he had. And, that's not necessarily an obligation; it's not that you—it doesn't have to become a contest where you go to every school play, you go to every school trip, you do all those things. . . . But I think the history here, once again, is that both parents are very good custodians here.

I—I come down, after considering all the arguments and circumstances that have been raised, to thinking that the *pendente lite* order which, once again, I spent considerable time thinking about and thinking this was a good arrangement and one that would be in the best interest of David—I think that that's where I come down today. And I think there is some difficulty of these folks communicating ... [but not] something that indicates, you know, real severe

problems. And where I come down is that-that the primary physical custody of the—David should be granted to the Plaintiff, Ms. Gordon, subject to the visitation with the Defendant on the schedule that we articulated in the *pendente lite* order. I'm not simply doing that as a conclusion, because it is a *pendente lite* order, but even thinking about all the alternatives here, I think that's still the best thing to do at this juncture.

I do think the parties should have joint legal custody of the child, and I think they can work things out on that. I think as to the holidays, I think the parties should alternate the holidays annually.[9]

\* \* \*

As to the summer vacations, I think each side should have two weeks where—not subject to, obviously, to the other access schedule; two weeks that they can designate, and there should be a time set for the designation of that. And if the parties can't agree on that, the Court will establish that. And those two weeks may—may or may not be consecutive weeks. The—spring break will be as suggested by the Plaintiff here. It will alternate, but it will be the entire spring break. I think the Christmas break should alternate, in the—I think with the Christmas break from school, I think we can have that, with the exception of the Christmas Eve and Christmas Day, which would be per the prior order.

With respect to child support, the court said:

[A]s to the child support issue, I must admit that there-there is certainly an argument on Mr. Gordon's part about the—the impoverishment, the voluntary impoverishment issue. But looking at the entire context of this situation and Mrs.—why Mrs. Gordon left the last high-paying job that she had, and her current efforts, I don't see this as being something done for purposes of this litigation or purposes—

---

9. The court's oral ruling included an equal division of various holidays.

I see it as a career move, and it may be that there were other motivations other than the best career move, or the best monetary career move, for her, but I don't think [it] amounts to voluntary impoverishment under the standards set by the cases. I think the—we can establish the incomes at the place established in the worksheets that [appellee's counsel] has proposed. I think those are fair and supported by the evidence with—based on Mrs. Gordon's earnings of Thirty–Five Thousand Seven Hundred and Thirty–Seven; Mr. Gordon's based on this figure of Sixty–Eight Fifty–Two per month based on his bi-monthly pay figures that are in evidence in this case. I think the work-related child care expenses are as shown. I think this—and I'd ask people to do the calculations on the—on the nights. I think that we'll find out is that it is in—becomes into a shared custody situation. Counsel can't agree on that, but I think it's just a mathematical calculation. But I think we'll need to apply the shared Guidelines, child support obligation of-Sixty-Nine, which the Court support figure effective upon this case. which comes up with the—Mr. Gordon being Eleven will adopt as the child the entry of the decree in

Regarding the monetary award and *Crawford* credits, the court ruled:

[A]s we discussed in the arguments here, the parties . . . are kind of suggesting a walk-away with exceptions here, I guess. And I think there's a lot of attraction to that, since both sides are going to be left with their—their 401–K plans, there I.R.A.'s, their pension plans. And in consider-ing, you know, the factors on the marital property award, I think that—and considering the circumstances here . . . We have a marriage that is a ten-year marriage [at the time of separation], and that's not the shortest, not the longest. I think these parties were definitely mismatched. . . . I didn't see any elements of abuse here by either side. It seemed to—both were contributors at various points to the mar-riage, the wife being the—the more substantial financial contributor for a considerable period of time. She then left her job and—shortly before the separation. The husband

was unemployed for a while. *But they both have been financial contributors and also contributed to the care of the minor child,* and both contributed to the various aspects of the marriage. And I do find—*I do find, in dealing with the Thirty Thousand dollars that I think it is undisputed, and I certainly find it to be the case, that Mrs. Gordon contributed to the purchase of the 6424 Empty Song Way from her pre-marital funds; that that should be recognized and she should be given a credit for that.* And as discussed in the arguments with counsel, you can factor it in a couple of different ways. *And whether it's through a marital award or through just recognizing it as pre-marital money, I think she should get the credit off of that when the house is sold.* I also think she should get the credit for the fixing of the furnace. I understand the argument on Mr. Gordon's part about that, but he's basically contributed nothing to this—the upkeep of the home, other than paying—when the order was entered, paying child support. And I think in fairness, whether you look at it one way or another through a marital award or otherwise, that she should get that recognition. I'm not going to give any—I'm not going to treat as any type of an award the Fifteen Thousand from the home equity line. I—I don't see that as meriting the same type of award or treatment. And as to the-as to the Crawford credit issue, I—I agree with Mrs. Gordon to allow the ... Once again, your calculations on that forty percent were [$16,468.80]?

\* \* \*

I'm going to grant those as Crawford credits off of the sale price. I think considering all the equities here, that that should be recognized and granted as Crawford credits. I realize it's discretionary, and I also understand Mr. Gordon's counsel's argument that it's—in his opinion, it's not payable here at all. But it certainly seems to me to be a fair thing to do in this particular case, considering all the circumstances, the benefits that Mr. Gordon got from the maintenance of this house, rather than having it go into

foreclosure; the upkeep of the house; the paying of the taxes, which he credits on his income tax; as well as, I believe, other credits off of the house on his income tax. Considering all of that, I think that that is—should be granted.

I think the form of the payment on all of these should be when the house is sold, these should be taken off the top, and then the balance would, obviously, be split equally—the balance of any proceeds would be split between the parties.

(Emphasis added.)

On June 6, 2006, the court docketed its "Judgment of Absolute Divorce," implementing, *inter alia*, the terms of its oral ruling as to custody. Effective May 1, 2006, appellant was ordered to pay appellee $1,097.00 per month as child support. The Judgment also set forth the following visitation schedule:

a. Dennis Gordon shall have David Gordon every other weekend beginning on Thursday after school (or daycare), until Monday at 8:00 a.m. when Dennis Gordon shall drop-off the child at school (or daycare);

b. Tuesday or Wednesday evening each week; on the Tuesday preceding Dennis Gordon's overnight weekend access it shall be from after school (or daycare) until 8:00 p.m.; and on the alternate weeks, it shall be Wednesday evening from after school (daycare) until Thursday morning at school (daycare); . . . . [10]

Further, the Judgment ordered that, by July 1, 2006, the parties were to list the marital home for sale, with appellee to have exclusive use and possession of the home until settlement. Moreover, appellant was ordered to pay appellee "*a marital award* of $32,829.00 ($30,000.00 pre-marital contribution towards purchase of the Home by Patricia Henley Gordon and $2,829.00 for furnace replacement) *to adjust the inequities*

---

10. In addition, the Judgment provided that the parties would alternate visitation with David on the holidays, spring break, and winter break. Both parties were also awarded two weeks of vacation time with David during the summer.

*in marital property* to be paid at closing on the Home[.]"
(Emphasis added.) As to the method of payment, the Judgment said:

> ORDERED, that upon the sale of the Home the net proceeds of sale (the sum remaining after deduction of all sums due to settle including, but not limited to, the mortgage balance, home equity line balance, liens of record, taxes, insurance and reasonable settlement costs, etc.) shall be distributed as follows: (1) Patricia Henley Gordon shall receive the first $32,829.00 from the net proceeds to fully satisfy the marital award; (2) Patricia Henley Gordon shall receive the next $16,648.00 from the net proceeds to fully satisfy the *Crawford* credit payable to her; and (3) the parties shall equally divide the remaining net proceeds.

By "consent of the parties," the court ordered the parties to retain all other marital property in accordance with title.[11]

## DISCUSSION

### I. The Monetary Award

It is undisputed that the parties' home was entirely marital property under Maryland Code (2004 Repl.Vol., 2005 Supp.), § 8–201(e) of the Family Law Article ("F.L."), which provides:

---

11. In particular, the Judgment stated:

> ORDERED, that by consent of the parties, Patricia Henley Gordon shall own as her sole and separate non-marital property all checking, savings, cash, 1993 Toyota Camry motor vehicle titled solely in her name, and all accounts in her name including, but not limited to, her AON 401(k) Plan, AON Pension Plan, T. Rowe Price IRA, ADP 401(k) PLAN, CIGNA 401(k) Plan and CIGNA Pension Plan, plus all personal property and personal effects currently in her possession; and it is further,
>
> ORDERED, that by consent of the parties, ... Dennis Gordon shall own as his sole and separate non-marital property all checking, savings, cash, 2001 Nissan motor vehicle titled solely in his name, and all accounts in his name including, but not limited to, his Provident 401(k) Plan, Provident Pension Plan, Bank of America 401(k) Plan, Bank of America Pension Plan, plus all personal property and personal effects currently in his possession; that Patricia Henley Gordon shall execute the title and the MVA Gift Form conveying her interest in the 2001 Nissan motor vehicle to Dennis Gordon as and when Dennis Gordon presents same to her[.]

(e) *Marital property.*—(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.

(2) *"Marital property"* includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.

(3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) excluded by valid agreement; or

(iv) directly traceable to any of these sources.

(Emphasis added.)

Title 8 of the Family Law Article governs the equitable distribution of marital property. Because the parties' home was marital property, appellee could only recover her $30,000 contribution by way of a monetary award pursuant to the statute.[12] F.L. § 8–205(a) states, in part:

### § 8–205. Marital property—Award.

(a) *Grant of award.*—(1) Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in property described in paragraph (2) of this subsection, grant a monetary award, or both, *as an adjustment of the equities and rights of the parties concerning marital property,* whether or not alimony is awarded.

(Emphasis added.)

It is well settled that, when a party petitions for a monetary award, the trial court undertakes "a three-step process which may culminate in a monetary award." *Alston v. Alston,* 331 Md. 496, 499, 629 A.2d 70 (1993); *see* F.L. §§ 8–203, 8–204, 8–

---

12. There was no "valid agreement" here by which the real property was "excluded" under F.L. § 8–201(e)(2). *See Karmand v. Karmand,* 145 Md.App. 317, 340, 802 A.2d 1106 (2002).

205. *See also Ware v. Ware*, 131 Md.App. 207, 213, 748 A.2d 1031 (2000); *Doser v. Doser*, 106 Md.App. 329, 349–50, 664 A.2d 453 (1995). First, for each disputed item of property, the court must determine whether it is marital or nonmarital. F.L. §§ 8–201(e)(1); 8–203; 8–205(a)(1). Second, the court must determine the value of all marital property. F.L. §§ 8–204; 8–205(a)(1). Third, the court must decide if the division of marital property according to title would be unfair; if so, the court may make a monetary award to rectify any inequity "created by the way in which property acquired during marriage happened to be titled." *Doser*, 106 Md.App. at 349, 664 A.2d at 464; *see* F.L. § 8–205(a)(1); *Alston*, 331 Md. at 499–500, 629 A.2d 70; *Long v. Long*, 129 Md.App. 554, 578–79, 743 A.2d 281 (2000).

Before making a monetary award, the court is required to consider the numerous statutory factors set forth in F.L. § 8–205(b). *Ware*, 131 Md.App. at 213–14, 748 A.2d 1031. However, "the trial court need not 'go through a detailed check list of the statutory factors, specifically referring to each'...." *Doser*, 106 Md.App. at 351, 664 A.2d 453 (citation omitted). Moreover, the statutory factors "are not prioritized in any way, nor has the General Assembly mandated any particular weighing or balancing of the factors." *Alston*, 331 Md. at 507, 629 A.2d 70.

F.L. § 8–205(b) provides:

(b) *Factors in determining amount and method of payment or terms of transfer.*—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in property described in subsection (a)(2) of this section,[13] or both, after considering each of the following factors:

---

13. F.L. § 8–205(a)(2) states, in part:

(2) The court may transfer ownership of an interest in:
(i) a pension, retirement, profit sharing, or deferred compensation plan, from one or both parties to either or both parties; and
(ii) subject to the consent of any lienholders, family use personal property, from one or both parties to either or both parties; and

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in property described in subsection (a)(2) was acquired, including the effort expended by each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

(Emphasis added.)

■■■■ Ordinarily, it is a question of fact as to whether all or a portion of an asset is marital or non-marital property. Findings of this type are subject to review under the clearly erroneous standard embodied by Md. Rule 8–131(c); we will not disturb a factual finding unless it is clearly erroneous. *Noffsinger v. Noffsinger*, 95 Md.App. 265, 285, 620 A.2d 415,

---

(iii) subject to the terms of any lien, real property jointly owned by the parties and used as the principal residence of the parties when they lived together. . . .

*cert. denied,* 331 Md. 197, 627 A.2d 539 (1993). With respect to the ultimate decision of whether to grant a monetary award, and the amount of such an award, a discretionary standard of review applies. *Alston,* 331 Md. at 504, 629 A.2d 70; *Malin v. Mininberg,* 153 Md.App. 358, 430, 837 A.2d 178 (2003); *Chimes v. Michael,* 131 Md.App. 271, 282–83, 748 A.2d 1065 (2000); *Gallagher v. Gallagher,* 118 Md.App. 567, 576, 703 A.2d 850 (1997), *cert. denied,* 349 Md. 495, 709 A.2d 139 (1998). "This means that we may not substitute our judgment for that of the fact finder, even if we might have reached a different result," absent an abuse of discretion. *Innerbichler v. Innerbichler,* 132 Md.App. 207, 230, 752 A.2d 291, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000). But, "a trial court must exercise its discretion in accordance with correct legal standards." *Alston,* 331 Md. at 504, 629 A.2d 70.

As we proceed with our analysis, we are mindful that the concept of a monetary award was proposed in the late 1970's as part of "an entirely new system of 'equitable distribution,' " and was intended to modify a legislative scheme that looked to title to determine ownership of property acquired during a marriage. *Alston,* 331 Md. at 504–05, 629 A.2d 70. Writing for the Court in Alston, Judge Eldridge admonised: "It is important that courts not lose sight of this history and purpose when making decisions about marital property." *Id.* at 506, 629 A.2d 70. The Court also said, *id.* at 506–07, 629 A.2d 70: "The history of the statute indicates that the General Assembly was primarily concerned with achieving equity by reflecting non-monetary contributions to the acquisition of marital assets, and this principle should be a major consideration in a trial judge's analysis."

The underlying purpose of the monetary award was also articulated in *Ward v. Ward,* 52 Md.App. 336, 449 A.2d 443 (1982):

> The monetary award is ... an addition to and not a substitution for a legal division of the property accumulated during marriage, according to title. **It is "intended to compensate a spouse who holds title to less than an equitable portion"** of that property.... What triggers

operation of the statute is the claim that a *division* of the parties' property according to its title would create an inequity which would be overcome through a monetary award.

*Id.* at 339–40, 449 A.2d 443 (internal citation omitted) (boldface added).

Appellant complains that the court improperly reimbursed appellee for her nonmarital contribution of $30,000, used in the purchase of the marital home, which was titled TBE. He insists that because Maryland law does not provide for "direct reimbursement" to appellee for her contribution, the court "thwarted" the statute by making a "facile" end run around it.

Mr. Gordon recognizes that a trial court is vested with discretion to make a monetary award to balance the inequities based on "title or otherwise." But, he maintains that there were no inequities in regard to the title or distribution of marital property in this case. Appellant points out that, because the parties agreed to distribute marital property in accordance with title, and more of it was titled to appellee than to appellant, appellant will actually "leave[] the marriage with a larger estate than Mr. Gordon. . . ." Thus, appellant insists that the court's decision to award appellee an additional $30,000 as a credit for her contribution contravened the legislative intent underlying the purpose of a monetary award.[14]

Characterizing appellee's $30,000 contribution as a gift to the marriage, appellant asserts:

> The parties were already married when the house was acquired as "tenants by the entireties." By statute, it became "marital property" as well. There were no documents executed that reserved that investment as the non-marital property of Mrs. Gordon, nor was there any assertion by her that she regarded these monies as hers. In fact, the issue never arose until after the present litigaion [sic] was underway.

---

14. *Appellant omits any discussion of F.L. § 8–205(b)(9).*

Review of Mrs. Gordon's testimony reveals that she made no averment that she had ever asserted a proprietary or non-marital claim to those funds. When called to the stand in rebuttal, she made no attempt to challenge the testimony of Mr. Gordon on this very point. Strangely, the Chancellor seems to have accepted ... the donative intent of her "contribution" of the money even while he seemed determined to restore the investment to Mrs. Gordon.

(Internal citations omitted.)

Appellee responds that a monetary award is not *"per se* improper" "**solely** because Appellee leaves the marriage with a larger estate than does Appellant." In her view, appellant's "argument ignores the legislature's specific mandate" in F.L. § 8–205(b)(9), by which the court may consider a party's contribution of nonmarital property, as defined under F.L. § 8–201(e)(3), used to acquire real property held as tenants by the entirety.

Moreover, appellee maintains that appellant "failed to carry his burden of proving" that her $30,000 contribution to the purchase of the marital home was a "gift." She argues:

As the purported donee of a gift, Appellant was required to carry the burden of establishing every element of a gift by clear and convincing evidence. Contrary to Appellant's assertions, however, the evidence of record does not support Appellant's claim of a gift.... [T]he trial transcript reveal[s] only that Appellant testified that Appellee offered to and did take $30,000.00 from her individual 401(k) account for the down payment on the marital home and that "[a]s far as [Appellant] was concerned, [Appellee] gave a gift to the marriage."

Furthermore, Appellant has provided this Court with no authority to support his arguments that Appellee's alleged intent—to clearly, unmistakably and permanently relinquish all interest in and control over the $30,000 contribution to the marital home—is established by the absence of executed documents reserving that investment as Appellee's nonmari-

tal property, or by Appellee's silence on the status of this contribution prior to the onset of the divorce litigation.

(Internal citations omitted.)

■ As we have seen, in its oral ruling the court stated that it could award the $30,000 to appellee on alternative grounds: "through a marital award or through recognizing it as premarital money...." As noted, in the Judgment the court characterized the payment as a "marital award," and made it payable to appellee before the parties divided the net proceeds of sale, i.e., it was payable "off the top." We conclude that the court committed legal error to the extent that it awarded appellee the $30,000 as a "credit ... when the house is sold." [15] Alternatively, to the extent that the court, in its discretion, determined to make a monetary award to appellee that included reimbursement of the $30,000, we cannot sustain the award, because it is not clear that the court considered all of the statutory factors, as it was required to do. [16] Nor can we

---

15. Similarly, the Judgment expressly reflects that $30,000 of the total marital award of $32,829 represented appellee's "premarital contribution towards purchase of the Home...."

16. The parties have not specifically complained that the court erred by making the $30,000 award payable "off the top," from the proceeds of sale, before the equal division to the parties of the net proceeds of sale. We observe that, under *Hart v. Hart,* 169 Md.App. 151, 164, 899 A.2d 965 (2006), decided shortly after the court issued its ruling in this case, we made clear that a "trial court does not have authority under *FL section 8–202(b)(2)* to distribute [the proceeds from the sale of a marital home] **unequally** ..." *Id.* (emphasis in original).

The General Assembly amended F.L. § 8–205(a)(2) in 2006, permitting courts to transfer an ownership interest in "real property owned by the parties and used as the principal residence of the parties when they lived together." The amendment does not apply here, however, because it is applicable only to divorce actions filed after October 1, 2006.

If the parties divide the net proceeds of sale on a 50/50 basis, as appellant wants, and take their other property by title, appellee would receive 53.6% of the marital property, while appellant would receive 46.4%. In contrast, if the parties evenly divide the house proceeds, and take their marital property based on title, but appellee also receives a monetary award that results in her receipt of $30,000 more in marital property than appellant receives, she would obtain 55.7% of the marital property, while appellant would receive 44.3%.

ascertain from the court's ruling the basis for its award. We explain.

Although appellee contributed $30,000 of her nonmarital funds towards the purchase of the marital home, the parties chose to title the home as tenants by the entirety. Therefore, under F.L. § 8–201(e)(2), the parties were co-equal owners of the home, which was entirely marital property.[17] *See Karmand v. Karmand,* 145 Md.App. 317, 340, 802 A.2d 1106 (2002). Because the home was entirely marital property, a monetary award is the only vehicle by which the court could "reimburse" appellee for her nonmarital contribution.

Of significance here, the statute does not authorize an automatic "credit" or "reimbursement" to a spouse who contributes nonmarital funds towards the acquisition of a marital home that is owned TBE. Rather, F.L. § 8–205(b)(9) permits a court, in its discretion, to recognize a nonmarital contribution used to acquire the real property. While F.L. § 8–205(b)(9) could, standing alone, support a monetary award under appropriate circumstances, it is just one of eleven statutory factors that must be considered by the court before making a monetary award.

Appellee relied only on F.L. § 8–205(b)(9) to justify her claim that she was entitled to recover her $30,000 contribution. In particular, she traced the source of the $30,000 to a "premarital asset." The court essentially ruled that because appellee contributed $30,000 from her nonmarital funds to acquire the home, "she should be given a credit for that." There is no indication in the court's oral opinion or in its Judgment that it relied on any of the other statutory factors in F.L. § 8–205(b) to justify its award of the $30,000.

To be sure, the court mentioned a few statutory factors in its ruling. For example, it observed that the parties had been

---

17. There was no evidence suggesting that, at the time of appellee's contribution, the parties agreed, formally or informally, to reimburse appellee for her contribution in the event of a divorce. Therefore, the court's decision to reimburse appellee could not have been founded on such an agreement or understanding.

married about ten years when they separated, which it characterized as "not the shortest, not the longest." The court also described the parties as "definitely mismatched," yet it did not ascribe fault for the dissolution of the marriage. And, the court recognized that both spouses "were contributors at various points ... both have been financial contributors and also contributed to the care of the minor child, and both contributed to the various aspects of the marriage." Thus, the court's observations were essentially neutral, and do not appear to have been the basis for its monetary award to appellee of $30,000. Moreover, the court did not appear to assess whether there was any inequity in regard to the way in which marital property was either titled or distributed to appellee. Indeed, (i.e., disposition by title led to receipt by appellee of approximately 56% of all other marital property).

A monetary award must comport with the underlying purpose of the statute, which is intended " 'to counterbalance any unfairness that may result from the actual distribution of property acquired during the marriage strictly in accordance with its title.' " *Hart v. Hart,* 169 Md.App. 151, 160–61, 899 A.2d 965 (2006) (citation omitted). *See Malin,* 153 Md.App. at 427, 837 A.2d 178. In this case, the propriety of the court's ruling must be analyzed in light of the parties' willingness to divide all of their other marital property by title, which the court effectuated through the Judgment.

As noted, appellee relied on the "source of funds" theory to support her claim. As we underscored in *Karmand,* 145 Md.App. at 341, 802 A.2d 1106, "the source of funds theory does not apply to an interest in real property held by the parties as tenants by the entireties," even if nonmarital funds "were applied to its purchase (so long as it was not excluded by valid agreement ....)." Consequently, "the fact that [appellee] used non-marital funds in the purchase of the parties' [marital] house could not mean that a portion of that property was non-marital." *Id.*

Our rejection of appellee's "source of funds" contention as a basis for the award has its origins in *Grant v. Zich,* 300 Md.

256, 477 A.2d 1163 (1984), which concerned the Property Disposition in Divorce and Annulment Act, the predecessor to the Marital Property Act. At the time of that case, marital property was defined in Md.Code (1974, 1984 Repl.Vol.), § 3–6A–01(e) of the Courts and Judicial Proceeds Article ("C.J.") which expressly provided that, "however titled," marital property does not include "property directly traceable" to property that was acquired before the marriage. *Id.* at 258–59, 477 A.2d 1163.

The wife claimed in *Zich* that the parties' home constituted marital property because it was acquired during the marriage and was titled as tenants by the entirety. *Id.* at 266, 477 A.2d 1163. In her view, a presumption of gift arose as to the nonmarital funds contributed by the husband to the purchase of the home. *Id.* The Court said, *id.* at 265, 477 A.2d 1163: "Manifestly, in characterizing this property as nonmarital or marital, the appropriate analysis to be applied is the source of funds theory."

Relying on *Harper v. Harper*, 294 Md. 54, 448 A.2d 916 (1982), the *Zich* Court rejected the position that the way in which the home was titled controlled the disposition of the real property. Instead, the Court looked to the source of funds for the purchase, explaining that, regardless of title, property is characterized as part marital and part nonmarital when it "is acquired by an expenditure of both nonmarital and marital property . . . ." *Id.* at 268–69, 477 A.2d 1163. Moreover, it stated that "a presumption of gift does not arise from the titling of property as tenants by the entirety.[ ]" *Id.* at 271, 477 A.2d 1163. *See also Dorsey v. Dorsey*, 302 Md. 312, 317, 487 A.2d 1181 (1985); *Watson v. Watson*, 77 Md.App. 622, 634–36, 551 A.2d 505 (1989).

The Marital Property Act took effect on October 1, 1984, shortly after *Zich* was decided. Amendments to the Act in 1994 supplanted the views expressed in *Zich, Dorsey,* and *Watson,* in which the source of funds was analyzed with regard to real property held as tenants by the entirety, in

order to determine whether such property was marital or nonmarital, in whole or in part.

Judge John Fader and Master Richard Gilbert explained the change in the law in their treatise:

> The Source of the Funds theory, to determine what part of a property is marital and what part is nonmarital, is not applicable to real estate held by tenants by the entireties. Effective October 1, 1994, all real property owned by tenants by the entireties "is" marital property. Thus, the discussion in *Harper v. Harper* and *Grant v. Zich* of the necessity to trace the source of the funds is no longer applicable to real estate titled as tenants by the entireties.[1]

JOHN F. FADER, II & RICHARD J. GILBERT, MARYLAND FAMILY LAW § 15–7(f), at 15–34 (4th ed. 2006) ("FADER"). Accordingly, under the current iteration of the statute, appellee is entitled to "reimbursement" for her nonmarital contribution only if it is consistent with the statutory provisions that permit a monetary award.

Here, without counting the $30,000 awarded to appellee by the court as reimbursement for her nonmarital contribution towards the purchase of the home, and exclusive of the award of *Crawford* credits and the equal division of the remaining net proceeds of sale of the marital home, and without considering that appellee also received an annuity that was marital property (which the court did not value), the division of all other marital property by title resulted in appellee "walking away" from the marriage with assets worth approximately $223,000 (± 56%). In contrast, appellant was to leave the marriage with approximately $172,000 in assets titled to him (± 44%).

Appellee's claim for reimbursement was based solely on the fact that she traced the $30,000 to her own money, and she wanted it back. In its ruling, the court concluded that appellee was entitled to a "credit" for her contribution, but it did not explain the basis for its conclusion. Thus, we cannot determine whether the court considered that, in dividing the re-

maining marital property by title, appellee was to receive considerably more property than appellant.

Moreover, reimbursement of appellee's nonmarital contribution does not appear consistent with the "walk away" agreement discussed by counsel at the outset of trial, by which the parties were to divide marital property in accordance with title. As we indicated earlier, appellee's counsel initially suggested that each party "keep what's in their name...." Because the parties' home was titled to both parties, such an agreement would ordinarily mean an equal division of the proceeds of sale of the house. No mention was made at that time that appellee also sought reimbursement for her nonmarital contribution of $30,000, i.e., that she wanted to divide marital property by title, except for the house, even though it was titled TBE.[18] Appellant's counsel subsequently responded that he was "perfectly satisfied with the parties keeping the titled positions," even though it would mean that "Mrs. Gordon will walk away with far more than Mr. Gordon." In any event, the court should not consider disposition of the parties' home—their most valuable jointly owned asset—without also considering that its disposition of the remaining marital property by title led to an award to appellee of more than half of all other marital property.

For the reasons discussed above, we shall vacate the monetary award and remand to the circuit court for further proceedings. On remand, the court will have the opportunity to articulate the pertinent considerations, if any, that support a monetary award to appellee.[19]

---

**18.** It was during appellee's testimony, over appellant's objection based on relevance, that appellee testified as to her nonmarital contribution of $30,000.

**19.** We recognize that there might well be circumstances when it would be appropriate for the court to make a monetary award to "reimburse" a spouse who contributed nonmarital funds to the acquisition of the marital home, even if one spouse will leave the marriage with a greater share of marital assets. Merely by way of illustration, we note that the parties' economic circumstances and health are factors to be considered under F.L. § 8–205(b). If the spouse who contributed nonmarital

## II. Custody

Appellant contends that the trial court abused its discretion because it "failed to grant child custody in accordance with" *Boswell v. Boswell*, 352 Md. 204, 721 A.2d 662 (1998). Appellant states:

> *Boswell* prescribes as a presumption that the best interest of the child is served by the "reasonable maximum exposure to both parents." This case was spawned by Appellee Mrs. Gordon's adamant refusal to concede that the best interest of David Gordon entitled him to "reasonable maximum exposure" with his father. Mrs. Gordon maintained her uncompromising position throughout the trial. While one ponders why there would be opposition to sharing the parental role with an historically involved and interested father, the legal point to be made is that the Appellee's persistent resistance fails to rebut the presumption established by *Boswell*.
>
> Appellant respectfully asserts that the Chancellor abused his discretion when he issued a child custody order that failed to reach the aspiration of *Boswell*. What is more, he did not articulate a reason for deviating from the *Boswell* teaching. The omission is passing [sic] strange in that it is inconsistent with the Chancellor's own forceful observation about the qualifications of each parent.

(Internal citations omitted.)

Appellant concedes that he will have "a significant amount of time" with his son pursuant to the Judgment, but asks: "Upon the evidence in this case, why should Appellant father have any less access with his son than does his mother, the

funds has an inferior earning capacity or suffers from an illness, for example, such "reimbursement" might well be warranted, even if the party seeking reimbursement is generally in a better position financially than the other spouse. Similarly, under the statute the parties' ages or the efforts of the parties to acquire the marital property are relevant considerations, and might justify "reimbursement." The length of the marriage is yet another statutory factor to be considered. In any event, we express no opinion as to the merits of a monetary award in this case; that is a matter for the court to resolve on remand.

Appellee, when the variables cited in *Boswell* favor liberality?" He adds: "If there were a significant reason, [he] would not have been awarded joint legal custody in the face of Appellee's determined opposition." Appellant continues:

> If there were a significant reason, there would be evidence offered to rebut the presumption. There was none! If there were a significant reason, the Chancellor would have articulated the facts that influenced his decree. He did not! The record proclaims Appellant's early, consistent and resolute request for equal time in the life of his son, David. Other than the unilateral opposition of Appellee to his paternal involvement, the record discloses no reason why his goal is not in David's best interest.

(Internal citations omitted.)

Among other things, appellee contends that the trial court "was fully aware of and considered the appropriate factors in rendering [its] decision as to visitation." She asserts "that it is well established under Maryland law that even in cases where there is an award of shared physical custody, which implicitly grants both parties maximum access to their child or children, that shared custody **may, but need not be,** on a 50/50 basis." (Emphasis in original.)

 Decisions as to child custody and visitation are governed by the best interests of the child. *See In re Karl H.,* 394 Md. 402, 416, 906 A.2d 898 (2006); *Boswell,* 352 Md. at 219, 721 A.2d 662 (noting that the best interests standard applies to custody as well as visitation, "because visitation 'is considered to be a form of temporary custody.' ") (citations omitted); *Giffin v. Crane,* 351 Md. 133, 145, 716 A.2d 1029 (1998)("The court's exercise of discretion must be guided first, and foremost, by what it believes would promote the child's best interest....."). Indeed, the child's best interest is of "transcendent importance." *In re Adoption No. 10941,* 335 Md. 99, 114, 642 A.2d 201 (1994). *See Sider v. Sider,* 334 Md. 512, 533, 639 A.2d 1076 (1994); *Monroe v. Monroe,* 329 Md. 758, 769, 621 A.2d 898 (1993); *McCready v. McCready,* 323 Md. 476, 481, 593 A.2d 1128 (1991). As the Court said in *Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964 (1986), the

best interest standard is "the objective to which virtually all other factors speak."

To be sure, there are no "bright-line rules" in custody matters. As the Court explained in *Domingues v. Johnson,* 323 Md. 486, 501, 593 A.2d 1133 (1991):

> The understandable desire of judges and attorneys to find bright-line rules to guide them in this most difficult area of the law does not justify the creation of hard and fast rules where they are inappropriate. Indeed, the very difficulty of the decision-making process in custody cases flows in large part from the uniqueness of each case, the extraordinarily broad spectrum of facts that may have to be considered in any given case, and the inherent difficulty of formulating bright-line rules of universal applicability in this area of the law.

Clearly, several factors must be considered by the trial court in deciding what is in the best interest of the child. *See Queen v. Queen,* 308 Md. 574, 587–88, 521 A.2d 320 (1987); *Hild v. Hild,* 221 Md. 349, 357, 157 A.2d 442 (1960); FADER, § 6–3, at 6–9. In *Montgomery County v. Sanders,* 38 Md. App. 406, 420, 381 A.2d 1154 (1977), the Court set forth a list of factors that a trial court should consider in making a custody determination, but cautioned against weighing any one factor "to the exclusion of all others." The *Sanders* Court said:

> The criteria for judicial determination [of child custody] includes, but is not limited to, 1) fitness of the parents; 2) character and reputation of the parties; 3) desire of the natural parents and agreements between the parties; 4) potentiality of maintaining natural family relations; 5) preference of the child; 6) material opportunities affecting the future life of the child; 7) age, health and sex of the child; 8) residences of parents and opportunity for visitation; 9) length of separation from the natural parents; and 10) prior voluntary abandonment or surrender.

*Id.* (internal citations omitted).

Of import here, an appellate court does not make its own determination as to a child's best interest; the trial

court's decision governs, unless the factual findings made by the lower court are clearly erroneous or there is a clear showing of an abuse of discretion. *Boswell,* 352 Md. at 224, 721 A.2d 662; *Giffin,* 351 Md. at 154, 716 A.2d 1029; *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 311, 701 A.2d 110 (1997); *Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994). Thus, our standard of review is quite deferential. *See Viamonte v. Viamonte,* 131 Md.App. 151, 157, 748 A.2d 493 (2000). Because a trial court is endowed with broad discretion in a custody proceeding, we may not set aside the trial court's judgment merely because we would have decided the case differently. *See Ross v. Hoffman,* 280 Md. 172, 186, 372 A.2d 582 (1977).

▮ Mindful of the principles outlined above, we are readily persuaded that the court did not abuse its discretion in regard to its custody determination. We explain.

As noted, in *Boswell,* 352 Md. at 211, 721 A.2d 662, the Court of Appeals addressed visitation restrictions imposed by the trial court on a homosexual father, which required the absence of the father's partner during the visitation. The Court vacated the restrictions, recognizing that "in almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent." *Id.* at 220, 721 A.2d 662. Of import here, the Court also observed that, while a "non-custodial parent has a right to liberal visitation with his or her child 'at reasonable times and under reasonable conditions,' . . . this *right is not absolute." Id.* (citation omitted) (emphasis added).

In the case at hand, appellant complains because he was not awarded joint physical custody of his son. Upon careful reflection, the court concluded that a 50/50 arrangement was not in the young child's best interest. Nevertheless, the court awarded appellant generous visitation; during every two week period, excluding holidays and other exceptions, David will spend five of fourteen nights with his father. The court was also mindful that appellant, at times, had not "completely utilized all opportunities" that he had for visitation. While the

visitation award is not equal, the division of time does not amount to an abuse of discretion.

## III. The *Crawford* Credit

The court acknowledged that, during the separation, appellee utilized marital funds to pay the expenses for the home. The court granted appellee a *Crawford* credit equal to 40% of her expenses, with the exception of the furnace, for which the full cost was assigned to appellant.

Appellant argues that the trial court abused its discretion in granting appellee a *Crawford* credit. He contends that the "equitable criteria that must be present to sustain" a *Crawford* credit, "if not entirely absent, are difficult to discern." He argues:

> In *Caccamise v. Caccamise, supra,* 130 Md.App. at 525, 747 A.2d at 231, this Court identified four circumstances that would preclude contribution: "(1) ouster; (2) agreements to the contrary; (3) payment from marital property; and (4) an inequitable result." Upon the record in this case, contribution is precluded under at least the third and fourth grounds.

Although appellant concedes that he was not "ousted" from the marital home, he posits that he was asked to depart, "under the circumstance of a long unraveling marriage which culminated in protracted discussions about separation." Thus, he argues that "the nature of his removal is at least an equitable factor that must be weighed."

In appellant's view, because appellee utilized marital funds to cover the marital home expenses, and because "the balance of hardship fell more or less equally upon the parties," there were no "compelling equities" to support the trial court's award of *Crawford* credit to appellee. Moreover, appellant points out that, when he vacated the marital home, the property taxes "had been pre-paid through June 2005 ... from a home equity line," and appellee utilized "other marital property accounts" to cover costs associated with the marital home between December of 2004 and April of 2006. He continues:

Of course, the physical act of separation imports considerable expense to Appellant, as he was required to obtain a new residence, furniture and the added expense of living alone. Meanwhile, Appellee continued to occupy the Marital Home, enjoying not only its comforts but also the tax advantages and the appreciation in value of the investment.

In December 2005, Appellant was ordered to pay the child support in the amount of $1,097 per month, retroactive to November 2004. He promptly borrowed the funds to pay the arrearage in lump sum payments totaling $9256.00. By definition, these funds were also "marital property," so their application to the mortgage or payment from the other marital fund sources, already noted, is not a proper occasion to apply a "Crawford credit."

(Internal citations omitted.)

Claiming that the court did not abuse its discretion, appellee asserts:

It should be noted initially that the award of a "*Crawford* credit" or contribution for a **portion** of payments made by one spouse on property jointly held by the parties following their separation and prior to divorce is not precluded, as a matter of law, where marital funds are used to make such payments.

Further, she argues:

Appellant's assertion that the Chancellor should have considered specifically Appellee's request that Appellant depart from the marital home "in unequivocal invitation," (which "unequivocal invitation," as noted earlier was disputed by the parties), Appellee's status as the "dominant economic spouse" prior to the parties' separation, the added expense of Appellant's living alone, and the appreciation in value of the marital home as an investment . . ., does not support the reversal of the Chancellor's award of a "*Crawford* credit" to Appellee.

Alternatively, appellee contends that, even if the court's award was improper under *Crawford*, "this Court should

nevertheless affirm said award as a monetary award under Section 8–205."

■ "Generally, one co-tenant who pays the mortgage, taxes, and other carrying charges of jointly owned property is entitled to contribution from the other." *Crawford v. Crawford,* 293 Md. 307, 309, 443 A.2d 599 (1982) (citations omitted). In *Crawford,* 293 Md. at 311, 443 A.2d 599, the Court said: "[A] co-tenant in a tenancy by the entireties is entitled, to the same extent as a co-tenant in a tenancy in common or joint tenancy is entitled, to contribution for that spouse's payment of the carrying charges which preserve the property."

As we recognized in *Baran v. Jaskulski,* 114 Md.App. 322, 328, 689 A.2d 1283 (1997), the *Crawford* case "abolished the presumption of gift between separated spouses and permitted a spouse to seek contribution in those instances when married parties were not residing together and one of them, or the other, had paid a disproportionate amount of the carrying costs of property." *See also Freedenburg v. Freedenburg,* 123 Md.App. 729, 737 n. 1, 720 A.2d 948 (1998). Elucidating the meaning of "Crawford Credits," we said in *Baran,* 114 Md. App. at 332, 689 A.2d 1283:

> Crawford Credits—the general law of contribution between cotenants of jointly owned property applies when married parties, owning property jointly, separate. A married, but separated, cotenant is, in the absence of an ouster (or its equivalent) of the nonpaying spouse, entitled to contribution for those expenses the paying spouse has paid.

■ Because preservation of the property accrues to the benefit of the co-tenant, a tenant by the entirety may also be entitled to contribution for payments of the mortgage and taxes. Thus, "Contribution is a factor that may be considered in making a monetary award. . . ." *Broseus v. Broseus,* 82 Md.App. 183, 192–93, 570 A.2d 874 (1990). On the other hand, a trial judge is "not obligated to award such contribution between husband and wife at the time of a divorce." *Imagnu v. Wodajo,* 85 Md.App. 208, 223, 582 A.2d 590 (1990); *see Kline v. Kline,* 85 Md.App. 28, 48, 581 A.2d 1300 (1990), *cert.*

*denied,* 322 Md. 240, 587 A.2d 246 (1991); *Wassif v. Wassif,* 77 Md.App. 750, 761–62, 551 A.2d 935, *cert. denied,* 315 Md. 692, 556 A.2d 674 (1989). Rather, the award of contribution is an equitable remedy within the discretion of the court. *Keys v. Keys,* 93 Md.App. 677, 681, 614 A.2d 975 (1992).

 We reject appellant's contention that he was, in effect, "ousted" from the marital home. " 'Ouster is the actual turning out or keeping excluded the party entitled to the possession of any real property.' " *Spessard v. Spessard,* 64 Md.App. 83, 88, 494 A.2d 701 (1985)(quoting *Childs v. Kansas City, St. Joseph & Council Bluffs Railroad Company,* 117 Mo. 414, 23 S.W. 373, 378 (1893)). "The exclusion does not require physical eviction, so long as 'the act or declaration constituting the ouster [is] unequivocal and notorious.' " *Id.* To prove ouster, the ousted party must show " 'actual intent to exclude the co-tenant permanently from his rights' in the property." *Id.* (citations omitted). Appellant's testimony established that he left the home in November of 2004, while appellee was on vacation with their child. Appellant left while his wife was away because "he didn't think [he] could depart peacefully" if he did so while appellee was present. Although appellant insists that appellee repeatedly asked him to leave, such repeated "invitations" do not amount to an ouster.

 On the facts of this case, we disagree with appellant's assertion that the court erred or abused its discretion in regard to the award of *Crawford* credits. Following separation, appellee paid virtually all of the expenses on the marital home, including the mortgage payments, homeowner's insurance, and real estate taxes. Yet, appellant claimed a portion of the house related expenses as deductions on his tax returns. It is also salient that the parties had agreed to end the marriage with whatever property was titled in their respective names. Appellee testified that, after the separation, she utilized almost $17,000 in savings from an account held in her name. In effect, then, appellee was forced to deplete a savings account that she otherwise would have retained upon divorce. Furthermore, appellant drew over $15,000 from the

home equity line between October 2003 and the fall of 2004 to meet his expenses. Yet, he was not held to account for that money.

In *Caccamise v. Caccamise*, 130 Md.App. 505, 747 A.2d 221 (2000), this Court upheld the award of a credit to the husband for 40% of the payments he made to maintain the marital home, in which he and his daughter lived during the parties' separation. This Court affirmed the decision of the circuit court, without discussing the source of the funds used to make such payments, stating that "the decision reached by the trial court ... was not clearly erroneous." *Id.* at 525, 747 A.2d 221.

In sum, the trial court did not abuse its discretion in awarding appellee a *Crawford* credit of 40% of her expenditures.

## IV. Voluntary Impoverishment

Mr. Gordon maintains that the trial court "erred when [it] declined to find that Appellee was voluntarily impoverished." In appellant's view, the trial court "misunderstood" that "a determination of voluntary impoverishment is to be determined as a matter of fact and not a matter of intent."

Appellant posits that appellee's "own testimony" indicates that she was voluntarily impoverished. He states:

> On the eve of her separation, amidst ongoing domestic strife and after inviting Appellant to depart, Appellee voluntarily resigned from her employment in which she expected to earn more than $120,000.00 in the year 2004. By the time trial concluded, she professed to be earning a salary of $25,000.00 per year plus an unknown bonus or commission.
>
> Appellee's earnings history suggests a high income capability. She had been earning in excess of six figures since the year 2000. What is more, her testimony constitutes an admission that she declined to seek comparable employment.

(Internal citations omitted.)

According to appellee, the judge's "determination that Appellee had not voluntarily impoverished herself was not based

on the perception that Appellee's current employment situation was the result of her intention to avoid child support." Thus, appellee insists that the court did not err in finding that she had not voluntarily impoverished herself.

It is well established that parents have an obligation to support their children. *Middleton v. Middleton*, 329 Md. 627, 633, 620 A.2d 1363 (1993); *Walker v. Grow*, 170 Md.App. 255, 265, 907 A.2d 255, *cert. denied*, 396 Md. 13, 912 A.2d 649 (2006); *Lacy v. Arvin*, 140 Md.App. 412, 422, 780 A.2d 1180 (2001); *Sczudlo v. Berry*, 129 Md.App. 529, 542, 743 A.2d 268 (1999); *Goldberger v. Goldberger*, 96 Md.App. 313, 323, 624 A.2d 1328, *cert. denied*, 332 Md. 453, 632 A.2d 150 (1993); *see also* F.L. § 5–203(b)(1) (stating that "[t]he parents of a minor child . . . are jointly and severally responsible for the child's support, care, nurture, welfare, and education"). Title 12 of the Family Law Article sets forth a comprehensive scheme with regard to parental child support.

A parent is voluntarily impoverished " 'whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.' " *Digges v. Digges*, 126 Md.App. 361, 381, 730 A.2d 202 (quoting *Goldberger*, 96 Md. App. at 327, 624 A.2d 1328), *cert. denied*, 356 Md. 17, 736 A.2d 1065 (1999). In *Wills v. Jones*, 340 Md. 480, 494, 667 A.2d 331 (1995), the Court of Appeals said that "voluntary" means that "the action [must] be both an exercise of unconstrained free will and that the act be intentional." A parent is not excused from support because of a tolerance of or a desire for a frugal lifestyle. *Moore v. Tseronis*, 106 Md.App. 275, 282, 664 A.2d 427 (1995) (citation omitted).

To determine if a parent is "voluntarily impoverished," the chancellor considers several factors as to the parent, including:

"1. his or her current physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure retraining if that is needed;

7. whether he or she has ever withheld support;

8. his or her past work history;

9. the area in which the parties live and the status of the job market there; and

10. any other considerations presented by either party."

*Goldberger*, 96 Md.App. at 327, 624 A.2d 1328 (citation omitted); *see Moore*, 106 Md.App. at 282–83, 664 A.2d 427.[20]

 Appellee explained that she left AON after she was reprimanded for poor performance. She was still married at the time, and testified that she consulted with appellant about her decision. As the mother of a three-year-old child, appellee then sought work that would provide her with some flexibility, located within reasonable proximity to the home and her son.[21]

---

**20.** If a court determines that a parent is voluntarily impoverished, the court must then determine the amount of "potential income" to impute to that parent in order to calculate the support obligation. *Goldberger*, 96 Md.App. at 327, 624 A.2d 1328; *see Wills*, 340 Md. at 490, 667 A.2d 331; *Wagner v. Wagner*, 109 Md.App. 1, 42–43, 674 A.2d 1, *cert. denied*, 343 Md. 334, 681 A.2d 69 (1996); *John O. v. Jane O.*, 90 Md.App. 406, 601 A.2d 149 (1992). Under F.L. § 12–201(b) "income" is defined as:

> (1) actual income of a parent, if the parent is employed to full capacity; or
> (2) potential income of a parent, if the parent is voluntarily impoverished.

(Emphasis added.)

F.L. § 12–201(f) defines potential income as follows:

> *Potential income.*—"Potential income" means income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.[]

**21.** Appellee indicated that she could earn more by working in the Washington, D.C. metropolitan area. However, that might necessitate

She began working for HCC several months later, in January of 2005, at a salary of $50,000, plus commission. In September of 2005, however, her compensation package was altered to commission only. By the time trial resumed in April of 2006, HCC was paying appellee a base salary of $25,000, plus commission. While appellee believed that HCC would ultimately become successful, she was looking for alternative employment, and had applied for other positions.

Our review of the record reflects that the court considered the evidence and the factors relevant to the issue of voluntary impoverishment. The court looked at "the entire context" and did not quarrel with appellee's decision to leave her employment with AON. As for her other jobs, the court determined that appellee made legitimate choices under the circumstances. It recognized that appellee's income was significantly less than her level of income before David was born. Yet, the court did not view appellee's decision to leave her position with AON as being "done for purposes of this litigation . . . ." Rather, the court saw appellee's decision "as a career move, and it may be that there were other motivations other than the best career move, or the best monetary career move, for her, but I don't think [that] amounts to voluntary impoverishment. . . ."

In our view, the court was not clearly erroneous in determining that appellee was not voluntarily impoverished. Nor did it err in attributing to appellee earnings of approximately $36,000 in order to calculate the parties' respective child support obligations.

**MONETARY AWARD TO APPELLEE VACATED; JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED IN ALL OTHER RESPECTS. CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS AS TO THE MONETARY AWARD. COSTS TO BE PAID 75% BY APPELLANT, 25% BY APPELLEE.**

---

her relocation to that area, which would, in turn, adversely affect appellant's access to David.